**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TINA BODKIN** and **THOMAS BODKIN**, on behalf of themselves and all others similarly situated, | Civil Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **ELIGO ENERGY, LLC** and **ELIGO ENERGY PA, LLC**, | **JURY TRIAL DEMANDED** |
| Defendants | |

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................. 1

PARTIES ....................................................................................................................... 3

JURISDICTION AND VENUE ...................................................................................... 6

FACTUAL ALLEGATIONS .......................................................................................... 7

    A.   The History Of Deregulation And ESCOs' Role In Energy Markets................................ 7

    B.   Plaintiffs' Dealings With Eligo.............................................................................. 20

    C.   Eligo's Unauthorized Pricing Practices ................................................................ 21

    D.   Tolling Of The Statute Of Limitations................................................................... 35

CLASS ACTION ALLEGATIONS ................................................................................ 36

CAUSES OF ACTION .................................................................................................. 40

COUNT I: BREACH OF CONTRACT .......................................................................... 40

COUNT II: IN THE ALTERNATIVE, BREACH OF THE IMPLIED COVENANT OF GOOD

FAITH AND FAIR DEALING ....................................................................................... 42

COUNT III: VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND

CONSUMER PROTECTION LAW ............................................................................... 45

COUNT IV: VIOLATION OF MATERIALLY IDENTICAL STATE CONSUMER

PROTECTION STATUTES............................................................................................ 49

COUNT V:  IN THE ALTERNATIVE, UNJUST ENRICHMENT ................................ 53

PRAYER FOR RELIEF ................................................................................................ 54

JURY DEMAND .......................................................................................................... 55

NOTICE TO ATTORNEYS GENERAL ........................................................................ 55

Plaintiffs Tina Bodkin and Thomas Bodkin (collectively, "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendants Eligo Energy, LLC and Eligo Energy PA, LLC (hereinafter "Eligo" or "Defendants") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This action seeks to redress Eligo's deceptive and bad faith pricing practices that have caused tens of thousands of commercial and residential customers in Pennsylvania, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, and Washington, D.C. to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.      Eligo is an independent energy service company ("ESCO") that sells electricity and natural gas in deregulated energy markets across the United States. Eligo has taken advantage of deregulation to exploit customers hoping to save on their energy costs.

3.      Eligo represents in its contracts with its electricity customers like Plaintiffs that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."[1] Elsewhere, Eligo's contract states that variable electricity rates will be calculated "based on" or "based upon" specified "factors" including "PJM wholesale energy market conditions," "weather patterns," "fluctuations in energy supply and demand," and "costs to serve customers."

---

[1] "PJM" is "PJM Interconnection LLC," which operates one of the world's largest competitive wholesale electricity markets and manages the reliability of the electricity transmission grid that transports that electricity. PJM manages the buying, selling, and delivery of electricity, and coordinates the movement of wholesale electricity in all or part of 13 states (Pennsylvania, Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Tennessee, Virginia and West Virginia) and the District of Columbia.

4.     Eligo's representations to consumers about how variable energy rates are calculated are false and deceptive, and designed to take advantage of customers' good faith and their lack of knowledge about, and access to, accurate information about how Eligo in fact sets its variable rates.

5.     In reality, Eligo did not charge variable rates based on PJM wholesale market prices and a $0.01 per kWh adder. Nor did Eligo calculate its variable rates based on the factors outlined elsewhere in its contract. Instead, Eligo used a pricing methodology, undisclosed to the consumer, that set variable rates based on Eligo's assessment of how high of a rate it could charge before too many customers quit. This methodology was employed with the intent of depriving customers of the benefits of a rate calculated in the ways Eligo represented to customers.

6.     Eligo's conduct represents a classic bait and switch: tell customers specific facts about how Eligo's variable rates are derived and then charge as much as Eligo thinks the customer will stomach (or not notice).

7.     Eligo's contract does not describe such a practice. Instead, it contains multiple misleading statements about how variable rates are calculated. Eligo's contract also does not provide Defendants with discretion to pick and choose other grounds for setting customers' variable rates. Nor does the contract provide Defendants with discretion to ignore the factors set forth in Eligo's contracts and then apply whatever markup it sees fit. Yet Eligo's varying and excessive markup strategy is the true methodology Eligo employed in setting its customers' variable energy rates, notwithstanding its contractual commitment charge rates "based upon" or "based on" the specific criteria outlined in the contract.

8.    Indeed, Eligo has always followed a uniform policy of charging a rate not calculated in accordance with the way Eligo describes to customers. Eligo has also admitted that its variable rates are set using factors that are not listed in Eligo's contract.

9.    As a result of Eligo's unlawful acts described herein, tens of thousands of unsuspecting customers have been, and continue to be, fleeced by Eligo out of tens of millions of dollars in exorbitant charges for electricity and natural gas. Defendants' scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

10.    Plaintiffs and other Eligo customers (the "Class") have been injured by Eligo's unlawful practices. Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Eligo's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

11.    Only through a class action can Eligo's customers remedy its ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Eligo's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers do not realize they are victims of Eligo's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Eligo engage in fair and upright business practices.

## PARTIES

12.    Plaintiffs Tina Bodkin and Thomas Bodkin reside in Butler, Pennsylvania. Plaintiffs are married to one another, and they share a home in Butler. Plaintiffs enrolled their home's electricity account with Eligo on or around June 2018. Eligo charged Plaintiffs a fixed

rate for electricity from in or around June 2018 until in our around June 2021, after which Eligo began charging a variable rate. Plaintiffs canceled their Eligo account in or around March 2022. Unbeknownst to Plaintiffs, Eligo charged them excessive and unauthorized variable rates every month they were on Eligo's variable rate plan.

13.     As a result of Eligo's deceptive, unlawful, unauthorized, and otherwise improper conduct, Plaintiffs paid more for their home energy supply than they otherwise should have paid.

14.     Defendant Eligo Energy, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Eligo Energy, LLC is a direct, wholly owned subsidiary of I2R Holdings, LLC. On information and belief, I2R has two members, ALEXG Holdings, LLC and MIF, LLC, whose sole members are Eligo's founders, Alex Goldstein and Mark Friedgan, who are citizens of Florida. Accordingly, Eligo Energy, LLC is a citizen of Florida.

15.     Defendant Eligo Energy PA, LLC is a Pennsylvania limited liability company with its principal place of business in Chicago, Illinois. On information and belief, Eligo Energy PA, LLC is a wholly owned subsidiary of Eligo Energy, LLC. Accordingly, Eligo Energy PA, LLC is a citizen of Florida.

16.     Defendant Eligo Energy, LLC completely controls and dominates its operating affiliates, including Defendant Eligo Energy PA, LLC. Eligo Energy, LLC and Eligo Energy PA, LLC hold themselves out as a single company—Eligo Energy.[2] Eligo Energy PA, LLC has no separate offices and operates out of Chicago, Illinois with Eligo Energy, LLC.[3] There is a unified executive team, and on information and belief they are all employed by Eligo Energy,

---

[2] Our Story, ELIGO ENERGY, https://www.eligoenergy.com/our-story (last visited Jan. 17, 2025).

[3] *See id.* (stating "Eligo Energy is a leading retail electricity supplier based in Chicago" and listing as its address "201 W Lake St, Suite 151 Chicago, Illinois 60606").

LLC.  That unified executive team controls all operational and financial aspects of Eligo Energy PA, LLC.  For example, in a separate consumer class action pending against Eligo Energy NY, LLC in the United States District Court for the Southern District of New York, the New York LLC's 30(b)(6) witness testified that a "very small group of people" does all of the work for the Eligo brand nationally.  Defendants have also admitted that attorneys at Eligo Energy, LLC were responsible for drafting customer communications and customer contracts.  Defendant Eligo Energy PA, LLC's current Controller, Chief Compliance Officer, Executive Chairman, VP of Risk and Trading, Data Scientist, and Financial Planning & Analytics Director are all paid for their employment by Eligo Energy, LLC.  All of these individuals were voluntarily designated by defense counsel in the S.D.N.Y. action as key players whose ESI will be collected for search in that matter.  Defendant Eligo Energy, LLC uses its operating affiliates, including Defendant Eligo Energy PA, LLC, to perpetrate the unlawful conduct challenged in this lawsuit.

17.    All of the operations and activities related to acquiring and servicing Eligo's customers (including Eligo's customers in Pennsylvania) are directed and executed by Eligo Energy, LLC, including marketing and making sales to Pennsylvania consumers, setting the exorbitant variable rates for those customers, purchasing electricity at wholesale, and handling billing and other back office activities.  Eligo Energy, LLC also owns and operates the computer software and hardware used to set rates for all Eligo customers, including Eligo's customers in Pennsylvania. Eligo Energy, LLC employs the individuals that conducted the activities challenged in this litigation.  For example, Eligo Energy NY, LLC's 30(b)(6) witness testified that Eligo Energy, LLC's executive team sets pricing strategy for New York customers. Those individuals include Eligo Energy, LLC's CEO, head of Risk team, and CIO.  Eligo Energy NY, LLC's 30(b)(6) witness also testified that he did not know if a separate group of people manage

Eligo Energy NY, LLC as opposed to Eligo Energy, LLC, he could not identify documents that list the names or roles of Eligo Energy NY, LLC's employees, and he could not identify the CEO of Eligo Energy NY, LLC.

18.    Eligo Energy, LLC also holds itself out to customers as their supplier of electricity and the contracting entity.  Although Plaintiffs' contract with Eligo states that the agreement is between Plaintiffs and Eligo Energy PA, LLC, the cover letter enclosing Eligo's contract, bears the following heading:

> ELIGOENERGY
> 201 W. Lake St. Ste 151
> Chicago, IL 60606

The letter further states that "[i]n the next few days, you will be receiving a notice from [the local utility] of change of your supplier **_to Eligo Energy, LLC_**." (Emphasis added).  Eligo's cover letter also states that they enclose "a copy of the Terms of Service with Eligo Energy" and are signed "Sincerely, Eligo Energy."

19.    Defendant Eligo Energy, LLC did not treat Defendant Eligo Energy PA, LLC as a separate entity.  Rather, it used the corporate entity Eligo Energy PA, LLC interchangeably with itself.  For example, invoices for wholesale electricity purchases from the New York Independent System Operator (NYSIO) for Eligo's New York customers were addressed to "Eligo Energy, LLC."  Similarly, invoices from New York electric utility companies (NY State Electric & Gas Corporation and Rochester Gas & Electric) addressed to "Eligo Energy NY, LLC" were paid from an account controlled by Defendant Eligo Energy, LLC.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

20.    This Court has jurisdiction over the claims asserted in this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the

Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and

diversity of citizenship exists between at least one member of the Class and at least one

Defendant.

### *Personal Jurisdiction*

21.     This Court has General and Specific Personal Jurisdiction over Defendant Eligo

Energy PA, LLC because it is a Pennsylvania limited liability company, and it advertises,

markets, distributes, and sells energy to Pennsylvania customers, including Plaintiffs.  This Court

has Specific Personal Jurisdiction over Defendant Eligo Energy, LLC because it advertises,

markets, distributes, and sells energy to Pennsylvania customers, including Plaintiffs.

### *Venue*

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue

is proper in "a judicial district in which any defendant resides, if all defendants are residents of

the State in which the district is located." 28 U.S.C. § 1391(b)(1).  Both Defendants are limited

liability companies that are deemed to reside in any judicial district in which they are subject to

the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to

this Court's personal jurisdiction, they reside in this District and venue therefore is proper in this

District under § 1391(b)(1).

## FACTUAL ALLEGATIONS

### A.    The History Of Deregulation And ESCOS' Role In Energy Markets

23.     In the 1990s and 2000s, numerous state legislatures and state regulatory agencies,

deregulated the market for retail energy supply.  Pennsylvania deregulated its electricity market

in 1996. In 1999, Pennsylvania deregulates its natural gas market. Among the goals of

deregulation was increased competition, with an eye towards reducing energy rates customers

and small businesses pay. As a result, the energy supply markets in Pennsylvania, New York, Connecticut, Illinois, Maryland, Massachusetts, Michigan, New Jersey, Ohio, and Washington, D.C. are open to competition, and customers and small businesses may choose their supplier.

24.    Since Pennsylvania opened its retail energy markets to competition, millions of Pennsylvania residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

25.    ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user customers.  However, ESCOs do not ***deliver*** energy to customers' homes and businesses, and many do not produce electricity or extract natural gas.  Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or gas, but merely buy energy from a producer and re-sell it to customers.  The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce costs to customers compared to what available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

26.    ESCOs like Eligo do not have to file their rates with the Pennsylvania Public Utility Commission (the "PUC") nor seek approval for the method by which those rates are set.

Instead, an ESCO customer's rates are governed by the contract between the ESCO and the customer.

27.    Customers who do not switch to an ESCO for their energy supply continue to receive their supply from their local utility.  For example, in Pennsylvania, as in many states, the utilities charge energy supply rates that are driven by the wholesale cost of energy on the PJM, supply and demand for that energy, weather patterns, the cost to serve customers, and industry regulation—the same costs that ESCOs like Eligo incur in Pennsylvania.  Indeed, in Pennsylvania, the PUC sets the supply rate of the local utility, WestPenn Power, based on WestPenn's costs and expenses to purchase and serve energy supply to its customers.[4] WestPenn's supply rate includes both the wholesale cost of energy purchased on the competitive wholesale supply market (via a competitive auction for 6-months of supply), the cost to transmit that energy to the point of delivery where WestPenn acquires the energy from the transmission system, and WestPenn's documented overhead attributable to its acquisition of customers' energy supply.[5]

28.    ESCOs like Eligo can purchase wholesale energy using the exact same wholesale market as utilities at the exact same prices. But ESCOs such as Eligo have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance of the time it is used by customers, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future

---

[4] First Energy Electric Company Tariff, p. 203-207, https://www.firstenergycorp.com/content/dam/customer/Customer%20Choice/Files/PA/tariffs/fe-pa-retail-tariff.pdf. WestPenn Power is a subsidiary of First Energy.

[5] *Id*.

at a predetermined price.  The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

29.    Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet Eligo's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from its commitment to charge variable rates equal to PJM wholesale market prices and a $0.01 per kWh adder.  Nor did Eligo calculate its variable rates based on the factors outlined elsewhere in its contract. Instead, using a predatory pricing methodology it deceptively hid from its customers, Eligo gouged customers with exorbitant electricity rates. Accordingly, no consumer would ever agree to Eligo's variable rate-setting practices if they knew the truth.

30.    The only way Eligo can retain variable rate customers is by hiding the fact that Eligo's rates are not "based upon" PJM wholesale market prices and a $0.01 per kWh adder. Eligo also hides the fact that it did calculate and charge variable rates "based on" the factors outlined elsewhere in its contract.

31.    Instead, Eligo's rates are the result of unbridled price gouging and profiteering. Eligo does not have discretion to merely "consider" PJM wholesale market prices and then add whatever markup it chooses. To the extent Eligo claims it has discretion in setting rates (it does not), that discretion is constrained by the contract's explicit promise that the customer's rates will be "based upon" PJM wholesale market prices and a $0.01 per kWh adder.  Likewise, any discretion is cabined by Eligo's statement that it will charge rates "based on" the specific factors outlined elsewhere in its customer contract. Any discretion Eligo may have had is also cabined

by customers' reasonable expectations that Eligo will not price gouge customers for the same energy sold by their local utilities.

32.    Eligo took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Eligo exploits deregulated markets by consistently charging its customers far more than its contract permits and failing to adequately disclose how its variable rates are actually determined.

33.    One of deregulation's main unintended consequences has been the proliferation of ESCOs like Eligo whose business model is primarily based on taking advantage of customers. In restructuring the Pennsylvania electricity market, the state legislature recognized that "electricity service is essential to the health and well-being of all residents . . . and should be available to all customers on reasonable terms and conditions." 66 Pa. C.S. § 2802(9). "[I]t is now in the public interest to permit retail customers to obtain direct access to a competitive generation market [and] safe and affordable transmission and distribution service." *Id* at (3).

34.    Unfortunately, Pennsylvania's hope for a more affordable energy market for consumers has gone unfulfilled. Data collected by Pennsylvania utilities makes clear that customers who switched to ESCOs paid significantly higher rates than they otherwise would have, had they remained with the default utility. One utility, FirstEnergy Companies, found that over a 58-month period from June 2013 to March 2018, nearly 65% of its low-income customers who switched to an ESCO paid higher rates than they would have had they not switched,

resulting in $18.3 million in increased electricity costs just to low-income consumers in the utility's service territory.[6]

35.    Another utility, PPL Electric Utilities Corporation ("PPL") found that low-income consumers in its service territory who switched to ESCOs paid an additional $2,743,872 over a 12-month period.[7]

36.    A 2024 report on Pennsylvania's Standard Offer Program ("SOP") illustrates ESCOs' predatory practice of ratcheting up variable rates at the conclusion of a fixed-rate period. Under the SOP, customers are assigned to ESCOs at a heavily regulated rate "generally guaranteed to save the customer money."[8] Once this regulated rate expires, customers are automatically switched to a variable rate with the same ESCO. According the 2024 report, conducted by Pennsylvania utility Duquesne Light, 89% of customers who continued as variable rate customers with their SOP-assigned ESCO paid more in the first month than they would have paid their local utility. Within that group, 84% paid over 10% more, 38% paid between 50-100% more, and 18% paid over 100% more. In the aggregate, the approximately 4,200 consumers who remained with their ESCO for four months after the SOP term paid $486,000 more than default service during this period—an overcharge of nearly $30 per consumer per month.[9]

---

[6] Motion of Commissioner David W. Sweet, Pennsylvania PUC, Electric Distribution Company Default Service Plans—Customer Assistance Program Shopping, Public Meeting (December 20, 2018). See http://www.puc.state.pa.us/pcdocs/1599226.pdf

[7] *Id.*

[8] Statement of Vice Chair Kimberly Barrow, Docket No. P-2024-3046008, (Pa. Pub. Util. Comm'n Jan. 8, 2025).

[9] Paul Ring, Report: Nearly 40% Of Customers Remaining With Retail Supplier After End Of Standard Offer Program Paid 50-100% More Than Applicable Price To Compare, EnergyChoiceMatters.com (Jan. 1, 2025), http://www.energychoicematters.com/stories/20250101a.html.

37.    Evaluating the SOP program, PUC Vice Chair Kimberly Barrow decried ESCOs' exploitation of unsuspecting enrollees, explaining that "SOP customers . . . are rolled into higher—never lower—monthly contracts [by ESCOs] . . . which, depending on the time of year, can result in exorbitant energy bills."[10]

38.    Worse still, Pennsylvania consumers hoping for cheaper electricity have endured years unfair and deceptive marketing and sales tactics by ESCOs. In 2022 the PUC "urge[d] Pennsylvania consumers to be alert for potential energy marketing scams."[11] In 2023, the Pennsylvania Office of Consumer Advocate and Pennsylvania Office of the Attorney General "urge[d] Pennsylvanians . . . to be careful and wary about door-to-door sales of energy."[12]

39.    In 2021, Defendant Eligo Energy PA, LLC was investigated by the PUC Bureau of Investigation and Enforcement for its own misleading and deceptive marketing practices, resulting in a settlement in which Eligo paid a civil penalty of $188,125.[13]

40.    These misleading practices have been particularly harmful during periods of high electricity prices, when consumers feel more pressure to shop for lower costs and are thus more vulnerable to deceptive marketing.[14] As Patrick Cicero, then-acting Consumer Advocate for the

---

[10] Statement of Vice Chair Kimberly Barrow, Docket No. P-2024-3046008, (Pa. Pub. Util. Comm'n Jan. 8, 2025).

[11] Press Release, Pennsylvania Public Utility Commission, PUC Urges Consumers to Be Alert for Energy Marketing Scams (July 18, 2022), https://www.puc.pa.gov/press-release/2022/puc-urges-consumers-to-be-alert-for-energy-marketing-scams.

[12] Office of Att'y Gen. of Pa., *AG Henry, Office of Consumer Advocate Urge Pennsylvanians to Explore Energy Options Amidst Increases; Be Aware of Door-to-Door Solicitation*, Pa. Off. of Att'y Gen. (Oct. 18, 2023), https://www.attorneygeneral.gov/taking-action/ag-henry-office-of-consumer-advocate-urge-pennsylvanians-to-explore-energy-options-amidst-increases-be-aware-of-door-to-door-solicitation/.

[13] *Pennsylvania Public Utility Commission, Bureau of Investigation and Enforcement v. Eligo Energy PA, LLC*, Docket No. M-2020-3019204 (Pa. Pub. Util. Comm. Oct. 29, 2020) (Joint Petition for Approval of Settlement).

[14] Pennsylvania Settles with Another Energy Supplier for Deceptive Marketing During Polar

Pennsylvania Office of Consumer Advocate, noted during a 2022 period of rising electricity prices, "I'm worried this is going to be a marketer's dream. They're going to market over the fear of price increases. And you may get a deal you don't want to get."[15] Rob Ballenger, director of the energy unit at Pennsylvania's Community Legal Services, also warned of the danger ESCOs pose to consumers, saying "[i]f someone knocks on your door and says, hey, I'm here to save you money on your electricity, you should be suspicious of that. I would just say no thank you and shut the door."[16]

41.    Pennsylvania is not the only state where there is overwhelming evidence of consumer harm from ESCO practices.  A 2021 analysis by the *Wall Street Journal*, for example, found that "in nearly every state where they operate, retailers have charged more than regulated incumbents."[17] Data from Massachusetts, Connecticut, Illinois, Maine, Maryland, New York, and Pennsylvania confirm that consumers pay far too much when they sign up with ESCOs instead of sticking with their utility companies.[18]

---

Vortex, *Nat. Gas Intel.* (Dec. 29, 2015), https://naturalgasintel.com/news/pennsylvania-settles-with-another-energy-supplier-for-deceptive-marketing-during-polar-vortex/.

[15] Susan Phillips, *Consumer advocates in Pennsylvania caution against switching electric suppliers as utilities rase rates*, StateImpact Pennsylvania (June 9, 2022), https://stateimpact.npr.org/pennsylvania/2022/06/09/consumer-advocates-in-pennsylvania-caution-against-switching-electric-suppliers-as-utilities-raise-rates-2/

[16] *Id.*

[17] Scott Patterson & Tom McGinty, *Deregulation Aimed to Lower Home-Power Bills. For Many, It Didn't*, WALL ST. J. (Mar. 8, 2021), https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623?page=16.

[18] Jenifer Bosco, *Retail 'choice': A bad deal for consumers and the planet*, UTILITY DIVE (Sept. 22, 2023), https://www.utilitydive.com/news/retail-choice-bad-deal-consumers-arrearages-renewable-energy-communitychoice/694355/.

42.    In 2023, both of Massachusetts' two United States Senators and a Massachusetts Member of Congress noted that "consumers—disproportionately in low-income communities and communities of color—have endured unfair and deceptive marketing and sales tactics by competitive electric suppliers, saddling those consumers with higher electric bills and costing them hundreds of millions of dollars in net losses."[19]

43.    The Legislators' Letter cites the findings of the Massachusetts Attorney General's office that "in the last seven years, individual residential customers who received their electric supply from competitive suppliers paid $607 million more on their electric bills than they would have paid to their default utility."[20] As the Massachusetts Attorney General testified to the state legislature, "these suppliers use deceptive marketing tactics that hide the fact that their products do not provide consumers with meaningful savings and in fact, can result in higher utility bills."[21] ESCOs' deceptive tactics also include, "failing to disclose industry consensus about price drops and that, if basic service prices decreased, consumers would pay higher prices under the competitive plan."[22]

44.    The Massachusetts Attorney General and the mayor of Boston noted in January 2024 that ESCOs in Massachusetts have employed "pervasive misleading marketing practices."[23]

---

[19] *Id.*

[20] *Id.* (citing Remarks of Attorney General Andrea Joy Campbell before the Joint Committee on Telecommunications, Utilities and Energy, Massachusetts House of Representatives (Sept. 21, 2023) ("MA A.G. Remarks"); *see also* Miriam Wasser, *Why a plan to drive down electric prices in Mass. Led to higher bills*, NPR (May 8, 2023), https://www.wbur.org/news/2023/05/08/massachusetts-eversource-national-grid-third-party-competitive-electricity.

[21] *Id.* (citing MA A.G. Remarks)

[22] *Id.* at 3.

[23] Andrea Campbell & Michelle Wu, Massachusetts Should Ban Third-Party Electric Suppliers, Bos. Globe (Sept. 29, 2024).

ESCOs like Eligo "have a track record of deploying aggressive, deceptive marketing tactics," and "routinely claim that the energy they sell helps Massachusetts achieve its clean energy goals" but "nothing could be further from the truth."[24]

45.     "Especially troublesome, the Attorney General's Office found that ESCOs have targeted vulnerable populations:

- low-income customers in Massachusetts are nearly twice as likely to sign up with ESCOs and are charged higher rates than non-low-income customers;

- assuming 600-kilowatt hour per month usage, typical for a Massachusetts household, an average non-low-income customer who signed up with an ESCO lost $222 per year while the average low-income customer lost $254 per year;

- low-income customers collectively experienced an annual net loss of more than $20 million due to higher rates and additional monthly fees;

- communities of color, communities with low median incomes, and communities with high percentages of residents lacking English proficiency correlate with higher rates of participation in the individual residential market for electric supply; and

- customers of advanced age who cannot understand the transaction or are particularly vulnerable are targeted and subjected to aggressive sales tactics."[25]

46.     In fact, "[f]orty percent of residents in Dorchester and Mattapan, two Boston neighborhoods with a high proportion of low-income residents, are enrolled with one of these

---

[24] *Id.*

[25] Legislators' Letter at 2 (citing MA A.G. Remarks; Susan M. Baldwin & Timothy E. Howington, *Consumers Continue to Lose Big: the 2023 Update to An Analysis of the Individual Residential Electric Supply Market in Massachusetts*, Massachusetts Attorney General's Office (May 2023), https://www.mass.gov/doc/consumers-continue-to-lose-big-the-2023-update-to-an-analysis-of-the-individual-residential-electric-supply-market-in-massachusetts/download, and *In re Liberty Power Holdings LLC*, Addendum to Proof of Claim Filed by the Commonwealth of Massachusetts, Case No. 21-13797-SMG (Bankr. S.D. Fla.)).

suppliers."[26] "Compared to the city's Community Choice Electricity program, residents have paid suppliers as much as $300 extra per month."[27]

47.    In New York, the staff of New York's utility regulator (that "NYPSC") made the following findings relevant here:

> [M]ass market ESCO customers have become the victims of a failed market structure that results in customers being fooled by advertising and marketing tricks into paying substantially more for commodity service than they had remained full utility customers, yet thinking they are getting a better deal.[28]
>
> * * *
>
> The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service. Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.
>
> Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers. For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[29]

---

[26] Campbell & Wu, n.23 *supra*.

[27] *Id.*

[28] CASE 12-M-0476, Dep't of Public Service Staff Unredacted Initial Brief, at 1, N.Y. Pub. Servs. Comm'n (Mar. 30, 2018).

[29] *Id.* at 41–42 (citations omitted).

* * *

> ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires. In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[30]

48.    As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[31]

49.    Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best. ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[32]

50.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market customers. These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than

---

[30] *Id.* at 86 (citations omitted).

[31] *Id.* at 37.

[32] *Id.* at 69.

the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[33]

51.    Thereafter, the NYPSC found that ESCOs' overcharging is completely unjustified and faulted ESCOs for concealing critical pricing data from both ordinary consumers **and the NYPSC itself**: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[34]

52.    The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[35] and required that ESCO bills show how much the consumer's utility would have charged.[36]

53.    In addition, and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[37] The legislation was

---

[33] *Id*.

[34] CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 31, N.Y. Pub. Servs. Comm'n (Dec. 12, 2019), https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}.

[35] *Id.* at 33.

[36] *Id.* at 33–34.

[37] Press Release, Governor Kathy Hochul, *Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills* (Sept. 20, 2023), https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills.

introduced after reports that ESCOs in New York, like Eligo, charge some of the highest residential energy costs in the United States.[38]

54.    Oregon's electric utility restructuring law allows for sales of alternative electric supply only to commercial and industrial customers, not to residential customers. Connecticut has banned the sale of variable rate electricity, and on May 8, 2024, the Governor of Maryland signed a retail energy market reform bill that prohibits ESCOs from charging variable rates that "exceed the trailing 12-month average of the electric company's standard offer service rate in the electric company's service territory"[39]

55.    There is also a growing call for increased civil enforcement.  For example, in December 2023 both of Massachusetts' United States Senators and a Massachusetts Member of Congress urged the Federal Trade Commission to begin enforcement actions against ESCOs because state regulatory enforcement activity has proven "difficult for state officials," and after ten years of pursuing ESCOs the Massachusetts Attorney General's office "has recovered only $19 million—a small fraction of the more than $600 million lost" by Massachusetts customers.[40]

**B.     Plaintiffs' Dealings With Eligo**

56.    In the summer of 2018, Eligo solicited Plaintiffs, and they agreed to switch their electricity supplier to Eligo.  As part of the enrollment process, Plaintiffs believe Eligo provided them with a packet of marketing material with a cover letter stating "[w]elcome to Eligo Energy,

---

[38] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

[39] *Maryland Gov. Signs Retail Market Reform Bill*, ENERGY CHOICE MATTERS, http://www.energychoicematters.com/stories/20240507z.html.

[40] Legislators' Letter at 3 (citing Chris Lisinski, State House News Service, *Mass. leaders eye changes to 'predatory' electric sales tactics*, WBUR (June 6, 2023), https://www.wbur.org/news/2023/06/06/mass-leaders-eye-changes-to-predatory-electric-sales-tactics).

authorized supplier of West Penn Power. . . . In the next few days, you will be receiving a notice

from West Penn Power of change of your supplier to Eligo Energy, LLC."  The letter also stated

that it enclosed "for your records" a copy of the "Terms of Service with Eligo Energy" and "a

copy of the PA customer disclosure."

57.    In its marketing packet, Eligo made representations about how variable rates were

calculated, as detailed below. *See infra* ¶¶ 62–70.

58.    Eligo's claims about its variable rates did not disclose that that Eligo would in fact

look to charge the variable rates that represented Eligo's assessment of how high of a rate it can

charge before running customers off.

59.    Had Plaintiffs known that Eligo would not uphold the explicit commitments it

made about how variable rates would be calculated, Plaintiffs would have acted differently—

namely, Plaintiffs would not have agreed to switch to Eligo.

60.    Eligo thereafter began supplying electricity to Plaintiffs' residence and it

continued to do so until they cancelled in or around March 2022.

61.    After approximately three years on Eligo's fixed rate, Eligo began charging

Plaintiffs a variable rate for electricity in or around June 2021.

**C.    Eligo's Unauthorized Pricing Practices**

62.    In the marketing packet Plaintiffs believe they received from Eligo, Eligo first

represents on a page with the heading "Fixed and Variable Rate Disclosure" that "[t]his label

pertains to an agreement for electric generation service between "Eligo Energy AP, LLC

("Eligo") and [customer]." The page also advises the customer that "[y]ou may cancel this

agreement at any time before midnight of the third business day after receiving this disclosure[.]"

The page also has a section called "Terms of Service" with a subheading called "Variable Price."

The "Variable Price" section of these "Terms of Service" states that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

63.     Another page in the marketing packet contains an untitled chart. The chart lists Eligo as being "responsible for all generation charges." The chart also has a "Price Structure" row that states "[y]our variable rate will be based upon PJM wholesale market conditions predicted weather patterns, retail competition, wholesale commodity energy costs, fluctuations in energy supply and demand, industry regulations, pricing strategies, cost to serve customers, among many factors." The chart also says that "[t]he supply price may not always provide savings" as compared to the customer's local utility.

64.     The packet contains a third page with the heading "Eligo Energy PA, LLC Terms of Service." That page has a paragraph titled "Price and Service" that states "for variable month-to-month products, Customer shall pay a variable price (derived from 100% renewable sources through use of Renewable Energy Credits) that can change monthly." The "Price and Service" paragraph also states that "Eligo may increase or decrease your variable rate based on several factors, including but not limited to changes in wholesale energy market prices in the PJM Markets, current and anticipated weather patterns, retail competition, wholesale commodity energy costs, fluctuations in energy supply and demand, industry regulations, pricing strategies, costs to serve customers, among many factors." The paragraph also states that "Vendor shall not impose any fees or charges on Customer other than the Price set forth above." The capitalized term "Price" is not defined anywhere in the marketing packet and there is no price "set forth above" other than in the "Variable Price" section of the "Terms of Service" that states that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01

per kWh will be applied." This same page also states that "Customer may cancel this agreement at any time before midnight of the third business day after receiving this disclosure[.]"

65.     Eligo uses the same or substantially similar marketing packets for other Eligo customers in Pennsylvania and in the other states where Eligo does business.

66.     There are essentially two different representations in Eligo's marketing packet regarding how variable rates are set. First, the "Terms of Service" in the page with the heading "Fixed and Variable Rate Disclosure" promises the customer that "[y]our variable rate will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

67.     Second, the page with the unnamed chart containing a row labeled "Price Structure" and the paragraph called "Price and Service" in the page with the heading "Eligo Energy PA, LLC Terms of Service" both promise that Eligo's variable rates are "based upon" and "based on" a formula that uses discrete "factors" to calculate variable rates. Both pages in the marketing packet state that the factors are (1) "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), (2) "weather patterns," (3) "retail competition," (4) "wholesale commodity energy costs," (5) "fluctuations in energy supply and demand," (6) "industry regulations," (7) "pricing strategies," (8) "costs to serve customers," and (9) and "many" other (unnamed) "factors." Again, on the "Eligo Energy PA, LLC Terms of Service" page, the paragraph that states what Eligo's variable rates are "based on" also states that "Vendor shall not impose any fees or charges on Customer other than the Price set forth above."

68.     In light of Eligo's representations in the "Terms of Service" on the page with the heading "Fixed and Variable Rate Disclosure" that the customer's rate "will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied," any reasonable

23

consumer, including Plaintiffs, would reasonably expect that Eligo's variable rates would be calculated using the relevant wholesale energy market price in the PJM plus a $0.01 per kWh adder.

69.     Given those same representations, no consumer would reasonably expect that Eligo's variable rates would be calculated based on an undisclosed pricing methodology designed to extract as much money as possible from consumers irrespective of Eligo's cost to purchase energy at wholesale.

70.     Regarding the indefinite list of "factors" Eligo also says its rates are "based on," any reasonable consumer reading those factors would not understand that Eligo would in fact be setting variable rates based on its assessment of how high of a rate it can charge before too many customers quit. Instead, a reasonable consumer reading Eligo's listed factors would expect Eligo to document and follow the listed factors and that customers' variable rates would only change in response to movements in the values of those documented factors. Indeed, if a reasonable consumer had previously been taught about how wholesale energy is purchased by utilities on the PJM and then how the utility sets the price for that energy when it resells it to the customer, it would not be unreasonable for the customer to think that Eligo's prices would be very close to the utility's prices, especially over the longer term.  Afterall, the utility is customers' main alternative to Eligo, and Eligo states in its marketing packet that "[t]he supply price may not *always* provide savings" (emphasis added) as compared to the utility thereby strongly suggesting that most of the time (or at least half of the time) Eligo's rates are lower than the utility's rates.

71.     Eligo's contract does not give Eligo discretion to set prices as it sees fit. Instead, the contract restricts Eligo's rates to rates that are "based upon PJM wholesale market conditions and an adder of $0.01 per kWh."

72.     Eligo's exorbitant variable rates are not traceable to "PJM wholesale market conditions and an adder of $0.01 per kWh." Nor do Eligo's rates reflect monthly changes in a list of documented "factors" such as "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), "weather patterns," "wholesale commodity energy costs," or "costs to serve customers."

73.     Instead, Eligo's rates are explained by its practice of charging the highest feasible rate before customers notice their excessive energy bills and quit Eligo.

74.     Eligo is merely a middleman that buys energy at wholesale and resells it at a markup. Eligo's costs to supply customers with energy do not explain its exorbitant charges. The costs of energy and related minor charges on the relevant wholesale market do not account for Eligo's excessive rates. As detailed below, Eligo's variable rates far exceed those identifiable costs and were thus not reflective of "PJM wholesale market conditions and an adder of $0.01 per kWh," or any reasonable attempt to assign numerical values to the "factors" listed in Eligo's contract and then derive a variable rate in good faith.

75.     Instead, the only factor enumerated in the packet Eligo provides to prospective customers that would cause the customer's rate to materially vary from month to month is Eligo's cost to purchase its customers' energy supply on the relevant wholesale market.

76.     Eligo purchases its energy supply on the competitive wholesale market. The cost of wholesale energy is overwhelmingly the largest cost Eligo incurs. This is why Eligo contracts with customers to calculate and charge a variable rate using the cost plus formula in the "Terms of Service" page with the heading "Fixed and Variable Rate Disclosure." That formula, "PJM wholesale market conditions and an adder of $0.01 per kWh," aligns with an ESCO's role as an energy supply reseller.

77.     Eligo's supply costs do not explain Eligo's egregiously high variable rates or be the reason its rates are disconnected from changes in wholesale costs.  Eligo's overhead costs (which are minor compared to its much larger supply costs)—to the extent Eligo even documented and itemized such costs when it set customers' monthly variable rates (Eligo did not)—also do not explain the high variable rates charged, as Eligo has modest and largely fixed overhead costs.  For example, while Eligo has tens of thousands of customers, the address on its website and correspondence with customers "201 W Lake St #151, Chicago, IL 60606" is in truth the address of a tiny mailbox in a UPS store that provides "mailbox and postal solutions." Nor does the cost to serve customers, which is a minor cost in comparison to the costs to procure energy at wholesale, explain Eligo's outrageously high rates.  Nor were there any industry regulations that would justify Eligo's outrageously high rates.

78.     In fact, the utilities' rates also include recovery of supply-related overhead costs, yet Eligo's rates are far higher, reflecting Eligo's unreasonable and excessive margins.

79.     Eligo's outrageous rates are a result of its uniform and consistent practice of setting rates, not calculated from the factors enumerated in the contract documents given to prospective customers, but instead based on its assessment of how high of a rate it can charge before too many customers quit, irrespective of Eligo's cost to supply the energy it simply resells at a markup.

***Benchmark One:* PJM Wholesale Market Prices And An Adder Of $0.01 Per kWh.**

80.     A comparison of Eligo's rates to prevailing market costs in the PJM shows that Eligo does not set its variable rates in compliance with its customer contract.

81.     The table below, *see* ¶ 84, identifies (i) the variable rate Eligo charged Plaintiffs, (ii) the corresponding "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to in its customer contract as "PJM wholesale market conditions") plus a

$0.01 per kWh adder, and (iii) the differences between Eligo's rates and the rate promised in Eligo's contract.

82.    The PJM market prices below are based on the costs that an ESCO incurs supplying a retail customer for each billing period. The PJM market prices for electricity include the weighted day-ahead PJM electricity prices in Plaintiffs' respective utility zones, ancillary services costs, capacity costs, transmission costs, and various relatively small charges related to the NYISO.  These charges are tracked by PJM's Market Monitor, the external consultant that independently evaluates the PJM wholesale electricity market.  PJM's Market Monitor is appointed pursuant to PJM's Federal Energy Regulatory Commission regulation and tariff.

83.    That Eligo's rates are so vastly different from PJM market prices plus a $0.01 per kWh adder demonstrates that Eligo's variable rates do not represent any good faith effort by Eligo to charge customers a rate that aligns with the contract documents Eligo gives prospective customers. The PJM market prices also represent the costs and charges that that Eligo and other ESCOs incur in procuring energy supply for their retail customers. Each of these measures reflects the costs that Eligo's competitors, in the regulated or deregulated markets, incur.

84.    The below chart shows a comparison of the variable rates Eligo charged Plaintiffs for seven billing periods to a rate that is based on PJM market prices plus a $0.01 per kWh adder:

| Billing Period | Eligo Rate ($/kWh) | PJM Market Prices Plus A $0.01 Per kWh Adder ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/26/21 - 8/23/21 | $0.1237 | $0.0708 | 1.7 | 75% |
| 8/24/21 - 9/22/21 | $0.1201 | $0.0772 | 1.6 | 56% |
| 9/23/21 - 10/21/21 | $0.1630 | $0.0864 | 1.9 | 89% |

| 10/22/21 - 11/21/21 | $0.1630 | $0.0966 | 1.7 | 69% |
|---|---|---|---|---|
| 11/22/21 - 12/20/21 | $0.1806 | $0.0787 | 2.3 | 130% |
| 12/21/21 - 1/20/22 | $0.1806 | $0.0734 | 2.5 | 146% |
| 1/21/22 - 2/20/22 | $0.1656 | $0.0895 | 1.9 | 85% |

85.    The table above shows that Eligo's variable rates are consistently and substantially higher than a rate based on the formula set forth in Eligo's customer contract.

86.    Eligo's rates charged to Plaintiffs were more than 50% higher than the PJM market price plus a $0.01 per kWh adder in **every billing period**, were more than ***double*** the PJM market prices plus a $0.01 per kWh adder twice, and were, on average, ***over ninety percent higher*** than the PJM market prices plus a $0.01 per kWh adder.

87.    Eligo's rates also failed to fluctuate in accordance with PJM market prices plus a $0.01 per kWh adder.  For instance, between November 22, 2021 and December 20, 2021, the PJM market price plus a $0.01 per kWh adder was $0.0787, an ***19% decrease*** from the prior period. Eligo's rate for that same period, however, was $0.1806 per kWh, an ***11% increase*** from its rate during the prior period. During the next period, the PJM market price plus a $0.01 kWh decreased by another ***7%***, but Eligo's rate remained the same—and outrageously high—at $0.1806/kWh, nearly ***150% higher*** than the PJM market price plus a $0.01 kWh adder.

88.    That Eligo's rates do not track the PJM market prices is further proof that Eligo is not following its contractual commitment to its customers and is instead levying an excessive and unreasonable fluctuating margin.

89.    Eligo claims elsewhere in the marketing packet is gives to prospective customers that variable rates are "derived from 100% renewable sources through the use of Renewable Energy Credits."[41]

90.    That Eligo's variable rates are so much higher than its costs to acquire the electricity it sells to customers cannot be explained by the price of renewable energy credits. Even assuming that Eligo purchased RECs to cover 100% of customer usage, the average price Eligo could have paid for such RECs was only 1.8 cents per kWh.  To the extent Eligo purchased RECs covering less than 100% of usage, its REC costs would have been lower than 1.8 cents per kWh.

91.    Eligo's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling retail energy.  However, such a consumer would also expect that Eligo's profiteering would not be so extreme that its rates bear no relation to market prices but are instead outrageously higher.

***Benchmark Two: The Local Utility's Contemporaneous Supply Rate***

92.    A comparison of available information on the cost of wholesale energy (Eligo's primary cost to supply customers' energy, by far) shows that Eligo's variable rates are not "based upon" or "based on" a formula that uses discrete "factors" to calculate variable rates. Two pages in the marketing packet Eligo gives to prospective customers state that the factors are (1) "wholesale energy market prices in the PJM Markets" (which Eligo synonymously refers to as "PJM wholesale market conditions"), (2) "weather patterns," (3) "retail competition," (4)

---

[41] Renewable Energy Credit's or "REC" are tradable certificates that represents the environmental benefits of electricity generated from renewable sources by a different part. RECs are tradable commodities that can be bought and sold in the market.

"wholesale commodity energy costs," (5) "fluctuations in energy supply and demand," (6) "industry regulations," (7) "pricing strategies," (8) "costs to serve customers," and (9) and "many" other unnamed "factors." These factors overwhelmingly point to PJM market prices or events that affect PJM market prices, which are the exact same factors that drive the local utility WestPenn Power's contemporaneous supply rate.

93.    Publicly available data on the local utilities' rates, like WestPenn Power, which is the utility serving Plaintiffs' home, serve as an ideal indicator a price that is "based upon" or "based on" the factors Eligo outlines on two of the pages in the marketing packet given to customers. This is because the utilities' energy procurement costs are the same costs ESCOs like Eligo incur and the utility's rate serves as a pure passthrough of those costs.  Not only are local utilities Eligo's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy, which is what the "factors" outlined in Eligo's contract overwhelmingly point to.  Consequently, local utilities' supply rates are the ideal comparator for determining (at the pleading stage) whether Eligo's variable rates are actually "based upon" or "based on" a formula that measures the listed factors and uses those listed "factors" to derive customers' variable rates (as opposed to charging unsuspecting customers the highest possible price that will not produce unsustainable levels of customer attrition).

94.    In fact, Eligo has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term. Therefore, while Eligo's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate.  Using the utility's rates as a benchmark for the contract's

enumerated cost factors shows that Eligo's rates were driven by excessive mark-ups and profiteering.

95.     The following table compares Plaintiffs' variable supply rates from Eligo for seven billing periods to their local utility WestPenn Power's contemporaneous supply rates.

| Billing Period | Eligo Rate ($/kWh) | WestPenn Rate ($/kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 7/26/21 - 8/23/21 | $0.1237 | $ 0.0571 | 2.2 | 117% |
| 8/24/21 - 9/22/21 | $0.1201 | $ 0.0552 | 2.2 | 118% |
| 9/23/21 - 10/21/21 | $0.1630 | $ 0.0545 | 3.0 | 199% |
| 10/22/21 - 11/21/21 | $0.1630 | $ 0.0545 | 3.0 | 199% |
| 11/22/21 - 12/20/21 | $0.1806 | $ 0.0562 | 3.2 | 221% |
| 12/21/21 - 1/20/22 | $0.1806 | $ 0.0570 | 3.2 | 217% |
| 1/21/22 - 2/20/22 | $0.1656 | $ 0.0570 | 2.9 | 191% |

96.     The "Overcharge Percentage" column demonstrates the drastic difference between Eligo's rates for Plaintiffs' account and WestPenn's contemporaneous rates.  Eligo's rate was more than **double** WestPenn's rate in **every** billing period, and at least **triple** WestPenn's rate in four out of seven billing periods.  On average, Eligo's rates were **more than 2.8 times** WestPenn's rates.

97.     The local utility's rates are a reasonable, pre-discovery benchmark of the factors Eligo lists in its customer contract, especially since elsewhere in Eligo's customer contract the ESCO promises to charge PJM market prices plus a $0.01 per kWh adder.  As explained above, the local utility is Eligo's primary competitor in Plaintiffs' service territory, and the local utility's supply rate reflects the wholesale cost of energy, supply and demand for that energy, weather patterns, the cost to serve customers, and industry regulation—the same costs that ESCOs like

Eligo incur in Pennsylvania.  Thus, the utility's rate is an ideal benchmark for a rate that was calculated using a formula built on the "factors" Eligo describes in the marketing packet it gives to customers.

98.    The discrepancy between the utility's rates and Eligo's rates is thus attributable to Eligo's failure to charge variable rates "based upon" or "based on" a formula that uses discrete "factors" (especially the ones named in the documents Eligo gave to customers) to calculate Eligo's variable rates

99.    Further, that Eligo's states in its marketing packet that its variable rate energy is "derived from 100% renewable sources through the use of Renewable Energy Credits" does not does not account for Eligo's excessive variable energy rates.  For example, the cost to purchase renewable energy credits for 100% of the electricity Eligo supplied to Plaintiffs would have been, on average, less than two pennies per kWh—approximately 12% of Eligo's average rate. Indeed, Eligo's costs associated with purchasing credits or offsets are minimal compared to the cost of procuring energy in wholesale markets, and these costs cannot explain Eligo's exorbitant rates.

***Benchmark Three: Eligo's Own Fixed Rates***

100.    Eigo's own fixed rates, which are significantly lower than its variable rates, demonstrate that Eligo can cover both its supply and overhead costs and still make a reasonable profit.  In fact, because Eligo incurs greater financial risk to provide its fixed rate offerings as compared to variable rates, a reasonable customer would expect Eligo to add ***lower*** margins to its variable rates.  Yet the opposite is true.

101.    That Eligo's variable rates were so much higher than its fixed rates demonstrates that Eligo's rates were not set in accordance with the representations Eligo made to customers regarding its variable energy rates.

102.    There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Eligo charges its fixed rate customers.  Eligo's costs for serving variable rate customers and fixed rate customers are not substantially different.  In fact, Eligo's costs for serving variable rate customers are likely lower than Eligo's costs for supplying fixed rate energy.  The only reason that Eligo's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices and transparent violation of its contract's pricing term.

103.    Eligo's rates also cannot be explained by the price of renewable energy credits.  As noted above, the cost of renewable energy credits do not explain Eligo's excessive variable rates.

***Summary of Eligo's Omissions***

104.    No reasonable consumer who knew the truth about Eligo's exorbitant rates would have chosen it as an energy supplier.

105.    Eligo lulled customers into purchasing its energy supply via material misrepresentations and omissions about its variable energy rates.  Eligo did so to reap excessive profits at the expense of unsuspecting customers.  Eligo acted with actual malice, or wanton and willful disregard for customers' well-being.

106.    In this case, Eligo knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

107.    It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[42] and "Nudges."[43]

108.    Eligo's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that customers will compare Eligo's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.

109.    Eligo did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates customers' local utilities charge.  Eligo likewise failed to adequately disclose to Plaintiffs that in paying Eligo's variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from their local utility.

110.    Eligo knew that its variable rates were consistently and significantly higher than the local utility's rates.

---

[42] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[43] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

111.    Eligo's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

112.    Moreover, Eligo at no time alerted or informed Plaintiffs that the cost for energy would be continuously *significantly* higher than the same energy sold by their local utility.

113.    A reasonable consumer understands and expects that variable energy rates will reflect the wholesale price for the commodity, that is, the wholesale market price available to Eligo for the energy it in turn supplies to its retail customers.

114.    However, Eligo's variable rates are much higher than wholesale market price of energy in Pennsylvania.

115.    Eligo's omissions with respect to the rates it would charge were materially misleading.

**D.    Tolling Of The Statute Of Limitations**

*A.    Continuing Violation Tolling Allegations*

116.    Given that Defendants have engaged in a series of deceptive acts and omissions for which they billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Eligo's last wrongful act against Plaintiffs and other customers when Eligo last charged them a variable energy rate.

*B.    Fraudulent Concealment Tolling*

117.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein throughout the period relevant to this action.

118.    Instead of adequately disclosing its true practices to Plaintiffs and their other customers, Defendants actively concealed and misrepresented their true practices.

C.    *Estoppel Tolling*

119.    Defendants were under a continuous duty to disclose its practices to Plaintiffs and their other customers.

120.    Defendants knowingly, affirmatively, and actively concealed the true nature of their practices from Plaintiffs and their other customers.

121.    Based on the foregoing and the other allegations herein, Defendants are estopped from relying on any statutes of limitations in defense of this action.

D.    *Discovery Rule Tolling*

122.    Eligo's customers do not have access to information about its costs or how Eligo actually sets its variable rates. Nor do reasonable consumers undertake an examination of the difficult-to-access and interpret wholesale cost data applicable to their electricity market when assessing whether their electricity rates are too high. Accordingly, Plaintiffs and other Eligo customers did not realize that they were being overcharged.

123.    Nor would Plaintiffs and other Eligo customers consumers have discovered that Eligo was overcharging them in the exercise of reasonable diligence, given the information asymmetry and the difficulty if not impossibility of obtaining information about Eligo's actual costs and how Eligo actually sets its variable rates.

124.    Accordingly, Plaintiffs' and other Eligo customers' lack of notice, actual or constructive, that Eligo was overcharging them meant that they did not previously discover or reasonably should have discovered that they had a cause of action as a result of being harmed by Defendants' conduct.

## **CLASS ACTION ALLEGATIONS**

125.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential

and commercial customers in the United States who were charged a variable rate for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment (the "Class") and who had a contract with Eligo that specified that the variable rate would be based on prices in a specific wholesale market like PJM.

126.    Plaintiffs also bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all Pennsylvania residential and commercial customers who were charged for electricity or natural gas services by Eligo from the earliest allowable date through the date of judgment (the "Pennsylvania Subclass").

127.    As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendants.  Defendants have engaged in uniform and standardized conduct toward the Class and this case is about the responsibility of Defendants for their knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of Eligo's customers (the "Class Members") are materially the same.

128.    Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendants.

129.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

130.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Eligo.  Plaintiffs believe, however, that based on the publicly available data concerning Eligo's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Eligo's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

131.    The Class is ascertainable because its members can be readily identified using data and information kept by Eligo in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

132.    Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendants.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Eligo's conduct.

133.    Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

134.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

        a.    Whether Eligo's misrepresentations and omissions are materially misleading;

b. Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

c. Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

d. Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

e. Whether Eligo was unjustly enriched as a result of its conduct;

f. Whether Class Members have been injured by Eligo's conduct;

g. Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices; and

h. The extent of class-wide injury and the measure of damages for those injuries.

135.    A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendants' conduct.

136.    A class action is appropriate because Defendants have acted or refused to act on grounds generally applicable to all Class Members.

137.    A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

138.    Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

    a.    Whether Eligo's misrepresentations and omissions are materially misleading;

    b.    Whether Eligo breached its contract with Plaintiffs and Class Members by failing to set variable rates as promised in Eligo's contract;

    c.    Whether Eligo violated the duty of good faith and fair dealing in its customer contracts;

    d.    Whether Eligo's conduct violates various state consumer protection and unfair competition statutes;

    e.    Whether Eligo was unjustly enriched as a result of its conduct;

    f.    Whether Class Members have been injured by Eligo's conduct; and

    g.    Whether, and to what extent, equitable relief should be imposed on Eligo to prevent it from continuing its unlawful practices.

139.    Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (On Behalf Of The Class)

140.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.    Eligo customers have customer agreements whose variable rate terms are substantially similar.

142.    Plaintiffs and the Class entered into valid contracts with Eligo for the provision of electricity.

143.    Eligo represents in its customer contract that its variable rate for electricity "will be based upon PJM wholesale market conditions and an adder of $0.01 per kWh will be applied."

144.    Elsewhere, Eligo's contract states that variable electricity rates will be calculated "based on" or "based upon" discrete "factors" including "PJM wholesale energy market conditions," "weather patterns," "fluctuations in energy supply and demand," and "costs to serve customers."

145.    Upon information and belief, Plaintiffs were subject to the same or substantially similar contractual terms as all of Eligo's variable rate customers in the United States.

146.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Eligo charged for natural gas and electricity.

147.    However, Eligo failed to perform its obligations under its contracts to charge variable rates based on the criteria described in Eligo's contract. Instead, Eligo charged variable rates for natural gas and electricity that were based on Eligo's assessment of how high of a rate it can charge before too many customers quit.

148.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged a variable rate calculated from PJM market prices plus a $0.01 per kWh adder.

149.    Plaintiffs and the Class were also damaged as a result because they were billed, and they paid, a charge for natural gas and electricity that was higher than it would have been had Eligo charged variable rates "based upon" or "based on" a formula that uses discrete "factors" (especially the ones named in the documents Eligo gave to customers) to calculate Eligo's variable rates.

150. By reason of the foregoing, Eligo is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Eligo's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

151. Eligo Energy PA, LLC is not the only Defendant liable for this breach of contract claim. Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach. For example, the cover letter sent by Eligo Energy, LLC states that it will be Plaintiffs' new energy supplier and that "a copy of the Terms of Service with Eligo Energy" are enclosed "for your records."

152. Eligo Energy, LLC is also a party to the contract under agency principles. Eligo Energy, LLC's conduct in sending the cover letter and contract, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

153. In addition, Eligo Energy PA, LLC contracted on Eligo Energy, LLC's behalf.

154. And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## <u>COUNT II</u>
## IN THE ALTERNATIVE, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf Of The Class)

155. Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156. Plaintiffs and the Class contracted with Eligo for the provision of natural gas and electricity supply.

157. Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and

may be breached even if there is no breach of the contract's express terms. This cause of action is pleaded in the alternative to Plaintiffs' contract claims.

158.    Under the contract, to the extent Eligo had discretion to set the variable rate for natural gas and electricity, it was obligated to exercise its discretion in good faith.  Eligo exercised its discretion in bad faith.  Specifically, Eligo acted with a bad motive and continued to gouge customers.   Eligo has known for years (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.  Despite this superior knowledge, Eligo acted with a bad motive and continued to gouge customers and small businesses.

159.    Eligo's failure to disclose the material information (i) that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, (iii) that Eligo could, but failed to, provide customers with adequate advance notice of the variable rates it would charge, and (iv) that Eligo could, but failed to, adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged  is what permitted Eligo to charge Plaintiffs whatever it wanted—unburdened by disclosing the truth about its rate setting practices—and Plaintiffs

experienced the adverse consequences in the performance of the parties' agreement.

160.    Eligo also failed to disclose that it had no intention of charging a rate reflective of its actual costs, or that the primary factor it considers when setting the variable rates is its ability to obtain excessive and unreasonable profits from high rates without causing too much customer attrition when customers notice Eligo's excessive rates.

161.    Plaintiffs reasonably expected that Eligo's variable energy rates would not be continuously and significantly higher than the utility's rates, which provide the same energy supply as Eligo.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.

162.    Plaintiffs also reasonably expected that Eligo would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Eligo.  Eligo knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

163.    Eligo breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Eligo's variable energy rate would be commensurate with Eligo's costs.

164.    As a result of Eligo's breaches, Eligo is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

165.    Eligo Energy PA, LLC is not the only Defendant liable for this breach of contract claim.  Eligo Energy, LLC is also directly liable because it was the primary contracting party and thus directly liable for breach.  For example, the cover letter sent by Eligo Energy, LLC states that it will be Plaintiffs' new energy supplier and that "a copy of the Terms of Service with Eligo

Energy" are enclosed "for your records."

166.    Eligo Energy, LLC is also a party to the contract under agency principles.  Eligo Energy, LLC's conduct in sending the cover letter and contract, along with identifying itself as Plaintiffs' "supplier," demonstrates that Eligo Energy, LLC manifested an intent to be bound by the contracts it mailed to its customers.

167.    In addition, Eligo Energy PA, LLC contracted on Eligo Energy, LLC's behalf.

168.    And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for breaching the contract.

## <u>COUNT III</u>
## VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (UTPCPL 73 P.A.C.S.A. § 201-1 *et seq.*)
### (On Behalf Of Plaintiffs And The Pennsylvania Subclass)

169.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170.    Plaintiffs and Class Members purchased goods, namely, electricity, from Eligo for a personal, family, or household purpose, namely, for use in their shared home.

171.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits "unfair or deceptive acts or practices." 73 P.S. § 201-3(a).

172.    The UTPCPL defines unfair or deceptive acts or practices to include any "fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi).

173.    Interpreting this provision of the UTPCPL, the Pennsylvania Supreme Court has explained that "an act or practice is deceptive or unfair if it has the capacity or tendency to deceive, and neither the intention to deceive nor actual deception must be proved; rather, it need

only be shown that the acts and practices are capable of being interpreted in a misleading way."

*Gregg v. Ameriprise Financial, Inc.*, 664 Pa. 567, 585 (2021) (quoting *Commonwealth by*

*Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 625 (2018)).

174.    Eligo has engaged in, and continues to engage in, deceptive acts and practices in

violation of 73 P.S. § 201-3(a), including:

      a.  Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

      b.  Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

      c.  Failing to provide customers adequate advance notice of the variable rates it would charge;

      d.  Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

      e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

      f.  Affirmatively misrepresenting how a customer's variable rate will be determined.

175.    The above deceptive practices and acts by Eligo were material misrepresentations

or omissions of existing or past facts.

176.    Each of the above material misrepresentations or omissions was a fraudulent and

deceptive practice.

177.    Plaintiff and Class Members justifiably relied on Eligo's material

misrepresentations and omissions. But for Eligo's material misrepresentations and omissions as

to how Eligo calculates electricity rates, and had Plaintiff and Class Members known of Eligo's

deceptive conduct, Plaintiff and Class Members would not have switched to Eligo.

178.    Eligo's acts are not only deceptive and unfair, but also contrary to the public policy underlying the UTPCPL, the "general purpose" of which "is to protect the public from fraud and unfair or deceptive business practices." *Coleman v. Commonwealth Land Title Ins. Co.*, 684 F. Supp. 2d 595 (E.D. Pa. Jan. 14, 2010).

179.    Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

180.    Each of Eligo's contracts include a multi-day rescissionary period.  During the rescissionary period, Eligo's contract serves as a solicitation because consumers may cancel the agreement before it becomes legally binding upon the expiration of the rescissionary period. Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the formula identified in the contract.  Eligo also knew that its variable rate is not in fact based on the formula identified in the contract.

181.    Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

182.    Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

183.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing was premised on offering customers a lower energy rate than the customer's local utility.

184.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

185.    Eligo's omission that Eligo's variable rates for energy were consistently substantially higher than the local utility rate is material to prospective customers.

186.    Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 174 above, Eligo deprived customers of the ability to make informed purchasing decisions.

187.    Eligo's practices are unconscionable and outside the norm of reasonable business practices.

188.    As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the formula outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members in an amount to be determined at the trial of this action or one hundred dollars ($100), whichever is greater. 73 P.S. § 201-9.2(a). Plaintiff and Pennsylvania Class Members are further entitled to have their actual damages trebled to an amount of not less than one hundred dollars ($100).

189.    Plaintiff and Pennsylvania Class Members are further entitled to their costs and reasonable attorneys' fees.

190.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. Pursuant to  73 P.S. § 201-9.2(a), this Court has the power to award such relief, including but not

limited to, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

191.     Eligo Energy PA, LLC is not the only Defendant liable for violating the UTPCPL. It was Eligo Energy, LLC that solicited Pennsylvania customers; it was Eligo Energy, LLC that sent the cover letters and contracts to Pennsylvania customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to Pennsylvania customers; and it was Eligo Energy, LLC that set the rates that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how variable rates would be calculated.

192.     And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for violating the UTPCPL.

<u>**COUNT IV**</u>
**VIOLATION OF MATERIALLY IDENTICAL STATE CONSUMER PROTECTION STATUTES**
**(On Behalf Of The Class)**

193.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194.     Pursuant to the materially identical consumer protection statutes of Connecticut, Illinois, Maryland, Michigan, New Jersey, New York, Pennsylvania, and Washington, D.C., consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

195.     Eligo violated at least the following materially identical statutes:

a.    Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b;

b.    Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2;

    c.   Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*;

    d.   Michigan Consumer Protection Act, M.C.L. § 445.903;

    e.   New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

    f.   New York General Business Law § 349;

    g.   Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4); and

    h.   District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904, *et seq.*

196.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

197.    Eligo's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

198.    Eligo has engaged in, and continues to engage in, deceptive acts and practices, including:

    a.   Failing to adequately disclose that Eligo's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    b.   Failing to adequately disclose that customers paying Eligo's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

    c.   Failing to provide customers adequate advance notice of the variable rates it would charge;

    d.   Failing to adequately disclose the variable rate methodology Eligo used to calculate its variable rates to enable customers to potentially compare prices;

    e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

    a.  Affirmatively misrepresenting how a customer's variable rate will be determined.

199.    The above unfair and deceptive practices and acts by Eligo were material omissions of existing or past facts.

200.    Eligo knew or believed that the above unfair and deceptive practices and acts were material omissions.

201.    The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

202.    Eligo first made these misrepresentations prior to the conclusion of the rescissionary period of the contract, during which Eligo's contract served as a solicitation.  The agreement is not legally binding prior to the expiration of the rescissionary period.  Thus, the contract is an advertisement in which Eligo misrepresents that the variable energy rates will be based upon the costs and factors identified in the contract. Eligo also knew that its variable rate is not in fact calculated using the formula set forth in its customer contract.

203.    Eligo's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Eligo.

204.    Eligo knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Eligo.

205.    Eligo knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Eligo was the customer's local utility.

206.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's marketing of variable rates was premised on offering customers a lower energy rate than the customer's local utility.

207.    Eligo knew at the time it signed up Plaintiffs and prospective customers that Eligo's variable rates for energy were consistently substantially higher than Plaintiffs and prospective customer's local utility rate, a rate based on market costs.

208.    Eligo's omission that Eligo's variable rate for energy was consistently substantially higher than the local utility rate is material to prospective customers.

209.    Eligo's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 192 above, Eligo deprived customers of the ability to make informed purchasing decisions.

210.    Eligo's practices are unconscionable and outside the norm of reasonable business practices.

211.    As a direct and proximate result of Eligo's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Eligo and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Eligo charged a rate based on the factors outlined in its contract, as well as the difference in Eligo's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting energy supply from Eligo.  By reason of the foregoing, Eligo is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

212.    Plaintiffs and the members of the Class further seek equitable relief against Eligo. This Court has the power to award such relief, including but not limited to, an order declaring Eligo's practices to be unlawful, an order enjoining Eligo from engaging in any further unlawful conduct, and an order directing Eligo to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

213.    As a result of Eligo's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

214.    Eligo Energy PA, LLC is not the only Defendant liable for violating these consumer protection laws.  It was Eligo Energy, LLC that solicited customers in Connecticut, Illinois, Maryland, Michigan, New Jersey, New York, Pennsylvania, and Washington, D.C.; it was Eligo Energy, LLC that sent the cover letters and contracts to these customers; it was Eligo Energy, LLC that drafted those letters and the contracts sent to these customers; and it was Eligo Energy, LLC that set the rates that that price gouged customers in contravention of the promises Eligo Energy, LLC made to customers regarding how rates variable rates would be calculated.

215.    And as alleged above, Eligo Energy PA, LLC is the alter ego of Eligo Energy, LLC and is thus liable for these consumer protection laws.

## COUNT V:
### IN THE ALTERNATIVE, UNJUST ENRICHMENT
#### (On Behalf Of The Class)

216.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs does not intend to proceed with their unjust enrichment claim.

218.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Eligo by contracting with Eligo for electricity or natural gas.  Plaintiffs and the Class would not have contracted with Eligo for electricity and natural gas had they known that Eligo would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

219.    Plaintiffs and the Class Members would not have purchased energy from Eligo had they known the truth about Eligo's variable energy rates.

220.    By engaging in the conduct described above, Eligo has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

221.    It would be unjust and inequitable for Eligo to retain the payments Plaintiffs and Class Members made for excessive energy charges.

222.    Therefore, Eligo is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Eligo's actions.

223.    As alleged above, Eligo Energy, LLC is also liable for this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendants have committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive practices alleged herein;

(e)    Render an award of punitive damages;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

## NOTICE TO ATTORNEYS GENERAL

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: Jan. 21, 2025  
Pittsburgh, Pennsylvania

**EDGAR SNYDER & ASSOCIATES**

By:      */s/ Nicholas Katko*  
Nicholas Katko (PA I.D. No. 322843)  
U.S. Steel Tower, 10th Floor  
600 Grant Street  
Pittsburgh, Pennsylvania 15219  
Tel: (412) 394-4516  
Fax: (412) 391-1830  
nkatko@edgarsnyder.com

*(Additional Counsel next page)*

Jessica L. Hunter[†] (PA I.D. No. 321951)
J. Burkett McInturff*
**WITTELS MCINTURFF PALIKOVIC**
305 Broadway, 7th Floor
New York, New York 10007
Tel: (917) 775-8862
Fax: (914) 775-8862
jlh@wittelslaw.com
jbm@wittelslaw.com

D. Greg Blankinship*
**FINKELSTEIN BLANKINSHIP**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*

[†]*Application Accepted, Swearing-In Forthcoming    *Pro Hac Vice Application Forthcoming*